```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                         NORTHERN DIVISION
```

ROBERT L. DANIELS,              )
                                )
          Plaintiff,            )
                                )
     v.                         )      No. 2:05 CV 55 DDN
                                )
FARMERS ELEVATOR AND EXCHANGE   )
CO. OF MONROE CITY,             )
BUTCH PENNEWELL, and            )
HARVEY TURNER,                  )
                                )
          Defendants.           )

### **MEMORANDUM AND ORDER**

This matter is before the court on the motions of defendants Butch Pennewell, Farmers Elevator and Exchange Co. of Monroe City (Farmers Elevator), and Harvey Turner for summary judgment (Docs. 30, 31, 36), the motion of defendant Farmers Elevator to bar the expert opinions of Mark Ezra (Doc. 34), the motion of Farmers Elevator to bar new opinions of Mark Ezra (Doc. 44), and the motion of Harvey Turner to strike (Doc. 52). The parties have consented to the authority of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 13.) A hearing was held August 31, 2006.

### **Pleadings**

Plaintiff Robert L. Daniels brought this action against Farmers Elevator, Pennewell, and Turner, alleging that he was injured when using a defective auger.[1] Daniels alleges in his amended complaint that on July 7, 2003, he was employed as a truck driver for Pike Feeds, Inc., and was sent by his employer with a truck to Pennewell's farm in Monroe County, Missouri, to pick up a load of cattle feed. Daniels alleges he assisted Pennewell with loading the feed into the truck from a grain bin, using an auger loaned to Pennewell by Farmers Elevator. He alleges that the auger had been sold by Turner to Farmers Elevator and that the auger had been modified by Turner before selling it to Farmers Elevator

---

[1]It is undisputed that this auger is a piece of farm equipment used to transfer grain or feed from one location to another.

by adding a metal box to the feeder end, a hydraulic motor without a kill switch, and other parts. Daniels alleges that these alterations rendered the auger defective and unreasonably dangerous, because it lacked a guard to prevent users from becoming entangled in the auger and being injured.

Plaintiff alleges that while helping Pennewell load the cattle feed into the truck, his left hand was entangled in the auger and he sustained injuries. Daniels alleges he lost his left thumb and index finger, his middle finger is immobile and without sensation, his left wrist is weakened, and his left hand, wrist, and arm are permanently scarred. He alleges he has undergone 12 surgeries and has suffered great pain and mental anguish. (Doc. 24.)

Count I asserts a claim of negligence against defendant Pennewell, alleging that Pennewell supplied Daniels with an unreasonably dangerous and unsafe auger, that Pennewell failed to immediately shut down the auger despite seeing plaintiff's arm entangled in it, that he failed to have another person shut it down, and that he failed to install the proper guards on the auger.

Count II asserts a claim for negligence against defendant Farmers Elevator, alleging that it knew the auger was defective and that it had a duty, when making a bailment of the auger to Pennewell, to supply the auger in a safe condition to Pennewell.

Count III alleges a claim for product liability against defendant Turner. Daniels alleges that at the time Turner sold the auger to Farmers Elevator, it was in a defective and unreasonably dangerous condition because it lacked a guard, that when Daniels used the auger, he did so in a manner reasonably anticipated, and that his injuries were a direct result of the modification. (Doc. 24.)

Defendant Pennewell alleges as an affirmative defense that Daniels is barred from recovery because he was contributorily negligent because he operated the auger in a negligent and reckless manner. (Doc. 8). Defendant Harvey Turner also argues that any damages plaintiff suffered were caused or contributed to by his own actions, because plaintiff failed to use the auger as reasonably anticipated, failed to use it as it was intended, and failed to take precautions that a reasonably

prudent person would take.  Turner also alleges that plaintiff's injuries were caused by conditions and actions out of his control, and that Mo. Rev. Stat. § 537.762[2] protects him from liability. (Doc. 9.) Defendant Farmers Elevator states as affirmative defenses that it owed no duty to plaintiff, that the auger was state of the art, that plaintiff assumed the risk, and that plaintiff misused the product. (Doc. 10.)

**Summary Judgment Standard**

Summary judgment must be granted, when the pleadings and proffer of evidence demonstrate that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Union Elec. Co. v. Southwestern Bell Tel. L.P., 378 F.3d 781, 785 (8th Cir. 2004).  The court must view the evidence in the light most favorable to the nonmoving party and accord it the benefit of all reasonable inferences.  Union Elec. Co., 378 F.3d at 785.  A fact is "material," if it could affect the ultimate disposition of the case, and a factual dispute is "genuine," if there is substantial evidence to support a reasonable jury verdict in favor of the non-moving party. Die-Cutting Diversified, Inc. v. United National Ins. Co., 353 F. Supp. 2d 1053, 1054-55 (E.D. Mo. 2004).

Initially, the moving party must demonstrate the absence of an issue for trial.  Celotex, 477 U.S. at 323.  Once a motion is properly made and supported, the nonmoving party may not rest upon the allegations in its pleadings but must instead proffer admissible evidence that demonstrate a genuine issue of material fact.  Fed. R. Civ. P. 56(e); Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 800

---

[2]This statute provides:

> 1. A defendant whose liability is based solely on his status as a seller in the stream of commerce may be dismissed from a products liability claim as provided in this section.

Mo. Rev. Stat. 537.762(1).

-3-

(8th Cir. 2004), cert. denied, 2004 WL 2153070 (U.S. Nov. 1, 2004); Krein v. DBA Corp., 327 F.3d 723, 726 (8th Cir. 2003).

**Undisputed Facts**

The record indicates that the following facts are without substantial dispute. Plaintiff Robert L. Daniels is an individual who resides in Illinois. He was, at all times relevant, employed as a truck driver for Pike Feeds, Inc., which is located in Pittsfield, Illinois. Pike Feeds is a distributor of feed for livestock. (Doc. 30 Attach. 2 at 1-2.) Defendant Farmers Elevator is a corporation organized under Missouri law with its principal place of business in Monroe County, Missouri. Farmers Elevator owned the auger at issue in the instant case when the accident occurred. Defendant Harvey Turner, d/b/a/ Turner Welding and Manufacturing, is an individual who is a resident of Missouri. (Doc. 30 Attach. 2 at 1.)

Turner Welding and Manufacturing is in the business of general repair of farm machinery, and performs other welding work. (Doc. 37 at 2.) Turner is an authorized dealer for Luffland Industries, a company that sells augers. Turner does not advertise that he sells augers, but could do so. (Doc. 36 Attach. 5 at 13-15.) Turner occasionally takes instructions from the customers about how to specifically fix their machines. Defendant Turner repaired and replaced parts on the auger at issue. While he had it in his possession repairing it, the owner, Donald Shelton, decided to sell the auger.[3]

While Turner had the auger in his shop, Scott Hayes, on behalf of defendant Farmers Elevator, approached Turner about buying the auger.

---

[3]There is a dispute in the facts about whether Shelton sold the auger to Turner, who in turn sold it to Farmers Elevator, or whether Turner held the auger for Shelton and Shelton sold it to Farmers Elevator. Mike Utterbeck, who worked for Farmers Elevator since 1976, stated in his deposition that Farmers Elevator bought the auger from Turner. (Doc. 33 Ex. C at 9.) Turner stated in his deposition that he never owned the auger. (Doc. 36 Attach. 5 at 28.) Turner paid Shelton $450 for the auger on June 21, 2000. That was the day Turner made the deal with Farmers Elevator to modify the auger. On July 7, 2000, Farmers Elevator paid Turner directly for the auger, $1,150. (Id. at 45-46.) But Turner felt he never owned the auger, and Shelton testified he never sold it to Turner. (Doc. 36 Attach. 7 at 14.)

-4-

Hayes wanted the auger modified for a specific use at Hayes's hog bin. Hayes gave Turner certain ways the auger must be modified, such as height dimensions. No one gave Turner drawings or designs for the auger. (Doc. 33 Ex. C at 10, Doc. 36 Attach. 5 at 34.) Turner modified the auger to work as requested. Turner bolted a rubber belting around the square hopper. The rubber guard was flexible so that it would bend. One purpose of the rubber belting was to keep feed from spilling out.[4] Farmers Elevator accepted the auger as modified.

Sometime after the auger left Turner's facility and the 2003 incident, the rubber belting Turner had placed on the auger was removed. The auger was used at other farms, like Pennewell's, and was not used exclusively at Hayes's farm for which it was modified. (Doc. 37 at 5.)

In July 2003, Pike Feeds agreed to remove bad feed from Pennewell's dairy farm. Farmers Elevator allowed defendant Pennewell to borrow the auger for use at Pennewell's farm to remove the bad feed and replace it with good feed. Pennewell did not sign a written contract and did not pay any deposit, rental, or compensation for use of the auger. There was no guard on the auger when Pennewell obtained it and he knew that, because he had borrowed that auger previously from Farmers Elevator. He never had used it when the rubber banding was present. (Doc. 33 Ex. B at 18-21.)

On July 7, 2003, plaintiff was sent to Pennewell's farm[5] to pick up a load of cattle feed. Plaintiff noticed that the auger did not have a guard on it when he got out of his truck and first saw the auger. When plaintiff arrived at Pennewell's farm, Pennewell was on a tractor, driving it to the auger to hook the auger to the tractor. Pennewell hooked the tractor up to the auger, and helped plaintiff get his truck near the auger so the feed would run into the Pike Feed truck. After the truck was filled, the auger was used to continue unloading the feed

---

[4]Turner stated in his deposition the rubber banding was put in place to make the auger safe. (Doc. 36 Attach. 5 at 36.)

[5]The farm land is owned by defendant Pennewell's father, Ollie Lee Pennewell, Jr. Defendant Pennewell owned half of the milk farm operation with his father, but his father had no responsibilities on the farm. (Doc. 33 Ex. B, deposition of Pennewell, at 9-10.)

into a bucket on a bobcat, so the feed could be otherwise disposed of. Plaintiff did not operate the tractor or the small bobcat in use that day. (Doc. 33 Ex. A at 2-3, Ex. B at 25-26.)

For the first 20 minutes of emptying feed into the bobcat's bucket, the feed ran out of the auger smoothly, but then a clog formed. Pennewell told plaintiff not to hit the side of the bin to knock the feed free, because he was afraid plaintiff Daniels would knock a hole in the auger. Instead, Pennewell himself hit the side of the auger. Plaintiff used a fiberglass stick that was nearby to knock the feed free from the mouth of the bin. Pennewell, too, used a stick to poke out the feed. (Doc. 33 Ex. B at 44.) The stick plaintiff used was between one and two feet long. When he used the stick in an effort to free the clogged grain, Daniels knelt on the ground in front of the auger. He used the stick for five or ten minutes before his stick got caught in the auger. Then his hand was pulled into the auger screw blade. Pennewell thereafter shut off the auger. He unhooked the auger from the tractor, drove the tractor to his house to call 911, returned to plaintiff in his truck, and drove him to the end of the road to meet the ambulance. (Doc. 33 Ex. B at 53-59.)

Plaintiff had been aware that augers could cause injury. (Doc. 33 Ex. A at 3-4.) He had been asked to pick up bulk feed two or three times in the past. Although he had seen augers used in the past, the only time he had used an auger at his job was on July 7, 2003. He had been trained to use an auger when he began working for Pike Feeds eight years earlier. (Doc. 33 Ex. A at 4, Ex D at 11-12.)

Plaintiff is receiving Workers' Compensation benefits for his injury. (Doc. 33 Ex. D at 16.)

### Discussion

First, the court must determine what law applies to plaintiff's state law claims of negligence and strict product liability. When the court has jurisdiction due to diversity of citizenship between the parties and the amount in controversy, it will apply the choice of law rules of the forum state, Missouri. <u>Erie v. Tompkins R. Co.</u>, 304 U.S. 64 (1938); <u>Dorman v. Emerson Electric Co.</u>, 23 F.3d 1354, 1358 (8th Cir.

1994). Missouri courts would look for the state that has the most significant relationship to the accident and parties. Dorman, 23 F.3d at 1358. The court will apply the law of Missouri as the rules of decision to these claims, because all defendants reside in Missouri, and this is where the alleged accident causing plaintiff's injuries occurred. From the facts of this case, Missouri has the most significant relationship to the facts of this case.

**A. Defendant Pennewell's Motion for Summary Judgment**

Defendant Pennewell moved for summary judgment, arguing that this court is without subject matter jurisdiction because any damages plaintiff sustained are exclusively within the realm of workers' compensation statutes because he was injured while on the job, and that Pennewell had no duty to plaintiff because he was an invitee and the danger was open and obvious. (Doc. 30 Attach. 2.)

Plaintiff argues that Pennewell retained possession and control of the premises and thereby owed a duty to plaintiff to use reasonable and ordinary care to prevent injury to the invitee.

The Missouri Workers' Compensation Law provides the exclusive rights and remedies for injured workers in Missouri. Mo. Rev. Stat. 287.120; James v. Union Electric Co., 978 S.W.2d 372, 374 (Mo. Ct. App. 1998). In Matteuzzi v. The Columbus Ptrshp, L.P., 866 S.W.2d 128, 132 (Mo. banc. 1993), the court held generally that a landowner is not liable for negligence to an injured employee of an independent contractor when that employee is covered by workers' compensation. Id. at 132; see also Mouser v. Caterpillar, Inc., 336 F.3d 656, 664 (8th Cir. 2003). The reasoning behind the holding is that a landowner would be subject to a "double liability." Matteuzzi, 866 S.W.2d at 131. When the landowner hired the independent contractor to perform work on his land, the landowner has already absorbed some of the cost of the independent contractor's workers' compensation coverage and then would be potentially liable, and have to pay a second time, for inherently dangerous conditions on his land. Id. Further, to hold otherwise would encourage landowners to forgo hiring expert independent contractors and

either do the work themselves or hire a nonexpert employee. Id. at 132.[6]

However, an independent contractor's employee, such as plaintiff Daniels, even though covered by workers' compensation, can recover if the property owner failed to use reasonable and ordinary care to prevent injury to a business invitee. Hunt v. Jefferson Arms Apt. Co., 679 S.W.2d 875, 879 (Mo. Ct. App. 1984). An employee of an independent contractor who has permission to use a landowner's premises or facilities is such an invitee. Matteuzzi, 866 S.W.2d at 132; Pauley v. Ball Metal Beverage Container Corp., ---F.3d---, 2006 WL 2381592 at *4 (8th Cir. 2006); Lawrence v. Bainbridge Apartments, 919 S.W.2d 566, 569 (Mo. Ct. App. 1996). However, the duty of care shifts from the landowner to the independent contractor "if the landowner relinquishes possession and control of the premises to the independent contractor" during the performance of the job. Lawrence, 919 S.W.2d at 569; Pauley, 2006 WL 2381592 at *4.

To show that the landowner has retained possession of the land, and is therefore subject to liability, the plaintiff must "show that the landowner controlled the jobsite and the activities of the contractor." Matteuzzi, 866 S.W.2d at 132.

> [T]he control must go beyond securing compliance with the contracts; the owner must be controlling the physical activities of the employees of the independent contractors or the details of the manner in which the work is done.

Halmick v. SBC Corporate Servs., Inc., 832 S.W.2d 925, 929 (Mo. Ct. App. 1992). "This is so even if the invitee is a covered employee under workers' compensation." Lawrence, 919 S.W.2d at 569 (unlocking doors for access, demanding that the window washing be done from outside, and being checked on periodically was not sufficient control to show the landowner retained possession).

Here, there is a genuine question of material fact about whether Pennewell retained possession of the land and exercised substantial

---

[6] Had plaintiff been performing inherently dangerous work and not covered by workers' compensation, landowner Pennewell could be liable. See Mouser, 336 F.3d at 665 n.8. There is no dispute that plaintiff was covered by workers' compensation.

control over plaintiff's work while the two used the auger to load the old feed into the truck. The parties dispute the facts surrounding the work done that day. Pennewell's view is that it was plaintiff's responsibility and he was just there to help, whereas plaintiff argues that it was not his job to load old feed, that Pennewell controlled how the work was done, and he was simply helping. Pennewell obtained the auger, told plaintiff not to hit it so he would not be responsible for any hole he might cause, operated the tractor, and operated the bobcat. He never left plaintiff alone to do the work himself. Such actions could show that Pennewell retained control over the land.

Therefore, defendant's Pennewell's motion for summary judgment is denied.

**B. Defendant Farmers Elevator's motion for Summary Judgment**

In its motion for summary judgment, Farmers Elevator argues that the loan of the auger to Pennewell was a gratuitous bailment to which plaintiff was not a party. As such, Farmers Elevator argues it had a duty to inform the bailee, Pennewell, of any known defects. But even assuming plaintiff was a party to the bailment, any duty Farmers Elevator owed him was satisfied when plaintiff used the auger knowing it had no guard. Farmers Elevator further argues that it is not liable because Pennewell selected the particular auger he borrowed.

Plaintiff argues that summary judgment should not be granted because the bailment was not gratuitous, and therefore, Farmers Elevator had the duty to deliver the auger in proper condition for use. Even if gratuitous, plaintiff argues that Farmers Elevator had a duty to warn of the known danger, and the fact that plaintiff knew the guard was missing is of no consequence; it does not absolve defendant from liability but at most is relevant to comparative fault. He also argues that he personally did not select the auger, and, either way, it was the only auger available.

To prevail on an action for negligence, the plaintiff must prove:

1) the existence of a duty on the part of the defendant to protect the plaintiff from injury, 2) a breach of that duty, 3) causation, and 4) injury to the plaintiff.

-9-

Madden v. C & K Barbecue Carryout, Inc., 758 S.W.2d 59, 61 (Mo. banc. 1988); Ostrander v. Duggan, 341 F.3d 745, 749 (8th Cir. 2003). The only element in dispute is whether Farmers Elevator owed a duty to plaintiff.

There is no dispute between the parties that Farmers Elevator was a bailor of the auger. The dispute lies in whether the bailment was gratuitous or for mutual benefit. The importance of this distinction is that the duty owed by the bailor in a bailment for mutual benefit is higher than that of a gratuitous bailor.

A gratuitous bailment is "created for the exclusive benefit of the bailee, as where the articles are loaned to another simply for his own use, without any reward or compensation . . . ." Bailey v. Innovative Mgmt. & Inv., Inc., 916 S.W.2d 805, 809 (Mo. Ct. App. 1995). In gratuitous bailment situations, the "bailor's only duty with respect to defects is to inform the bailee of any of which he is aware and which might make the use of the subject of the loan perilous to the bailee or his servants." Id. Therefore, the gratuitous bailor has no duty to inform the bailee of any defects of which he is not aware.

A bailment for mutual benefit confers some benefit, either reward or compensation, on the bailor. Bailey, 916 S.W.2d at 809. The Bailey court held that employee satisfaction resulting from being allowed to borrow tools was not enough of a benefit to make a mutual benefit bailment. Id. at 810. Citing the Restatement, Second, of Torts, a Missouri court has held that the bailor must lend the article for some "business purpose" for the bailment to be for mutual benefit. Ridenhour v. Colson Caster Corp., 687 S.W.2d 938, 946 (Mo. Ct. App. 1985); see also Hicks v. Six Flags Over Mid-America, 821 F.2d 1311, 1315 (8th Cir. 1987) (unless plaintiff established defendant loaned him the tamper for business purposes, he would have to prove actual knowledge of defect).

If the bailment is for mutual benefit of both the bailee and bailor, the "the bailor has a duty to deliver the loaned articles in a proper condition to be used by the parties." Bailey, 916 S.W.2d at 809. "If the bailor fails to provide the loaned articles in a proper condition, he is liable for any damage suffered by the bailee from the article's unsafe condition." Bailey, 916 S.W.2d at 809.

Defendant Farmers Elevator argues that the bailment was gratuitous, because it received no compensation for lending the auger. Plaintiff argues defendant's employees stated that the auger was specifically purchased to lend to area farmers for goodwill purposes, which is a benefit received by Farmers Elevator. One definition of "goodwill" is:

> b (1) : the favor or advantage that a business has acquired especially through its brands and its good reputation (2) : the **value** of projected earnings increases of a business especially as part of its purchase price (3) : the excess of the purchase price of a company over its book value which represents the **value of goodwill as an intangible asset** for accounting purposes.

Merriam-Webster Online Dictionary, http://www.m-w.com/dictionary/goodwill. No party disputes that goodwill is of value to a business. So there is a factual issue about whether Farmers Elevator received the benefit of goodwill for loaning the auger to area farmer Pennewell. Farmers Elevator and plaintiff dispute the reason Farmers Elevator loaned the auger. There are facts that indicate that Farmers Elevator purchased it to lend to its co-op members for goodwill, and Pennewell was a member of the Farmers Elevator co-op.

If the bailment was for mutual benefit, Farmers Elevator had a duty to provide the auger in the proper condition. Bailey, 916 S.W.2d at 809. There is a genuine question of material fact as to the proper condition of the auger. Here, it is undisputed that it was missing any protective guard at the time Farmers Elevator lent it to Pennewell. Whether this rendered the auger in an improper condition is a factual determination for the jury.

If the bailment was gratuitous, Farmers Elevator's only duty was to inform Pennewell of any defects it was aware of and which might make the use of the augur perilous to the bailee or his servants. However, there is no duty to warn of open and obvious conditions. Winn v. Pollard, 62 S.W.3d 611, 618 (Mo. Ct. App. 2001). A condition is open and obviously dangerous *by law* when defendant could "reasonably anticipate that plaintiff would recognize and protect [himself] from the danger . . . ." Morrison v. St. Luke's Heath Corp., 929 S.W.2d 898, 905 (Mo. Ct. App. 1996).

In Chism v. White Oak Feed Co., 612 S.W.2d 873 (Mo. Ct. App. 1981), the court found that an unguarded auger was not an open and obvious danger by law. In that case, the court found a question of fact existed about the open and obvious nature of the auger, because there was conflicting testimony about the visibility of the unguarded auger, including from what standing position it could be seen and the light around the auger. Id. at 877-78. The court found that "each case depends on its own circumstances. There is no precise formula by which to determine whether or not a condition is so 'open and obvious' one is bound to see it." Id. at 878-79 (quoting Shannon v. Washington University, 575 S.W.2d 235, 237 (Mo. Ct. App. 1978)). An open and obvious danger involves knowledge of the condition and appreciation for the danger it involves. Id. at 879.

Here, the unguarded auger was an open and obvious, and Farmers Elevator could have reasonably anticipated that plaintiff would have recognized the condition and protected himself from the danger. Unlike Chism, there is no factual dispute about the visibility of the unguarded auger. Daniels, Pennewell, and Farmers Elevator were all aware it was unguarded, and Daniels worked close enough to the augur to see that it was unguarded, even getting close enough to poke it with a stick. He saw that there was no guard on it and that there were moving parts. His deposition testimony states that he was aware of the danger.

Farmers Elevator also argues that it is entitled to summary judgment because Pennewell selected the particular auger he wanted, and "a bailor is not liable to third persons for injuries from the defective condition of a leased chattel which the bailee himself has specifically selected." (Doc. 32 at 4-5.) In Blankenship v. St. Joseph Fuel Oil & Mfg. Co., 232 S.W.2d 954, (Mo. 1954), the court held that normally, the bailor is not liable for injuries when the bailee selects the chattel himself. Id. at 1177. However, the auger in question was the only one available for loan. Pennewell did not choose the auger from other available stock.

Farmers Elevator's motion for summary judgment is denied.

**C. Defendant Turner's motion for Summary Judgment**

Defendant Turner argues that he is entitled to summary judgment on plaintiff's strict liability claim, because he is not a "seller" as defined in the law, he did not sell the auger in the course of his business, and the auger was materially altered after it left his shop. He also argues that the fact that he modified the auger to the exact specifications of Farmers Elevator is a complete defense to liability.

"Essential elements of a strict products liability claim are (1) the defendant sold a product in the course of its business; (2) the product was then in a defective condition, unreasonably dangerous when put to a reasonably anticipated use; (3) the product was used in a manner reasonably anticipated; and (4) plaintiff was damaged as a direct result of the defective condition that existed when the product was sold." Engel v. Corrigan Company-Mechanical Contractors, Inc., a Division of Corrigan Bros., Inc., 148 S.W.3d 28, 30 (Mo. Ct. App. 2004).

There is a genuine question of material fact about the transaction in which the auger was provided by Turner to Farmers Elevator. "[T]he test for determining the applicability of [strict liability] is not the sale of the product, but rather the placing thereof in commerce." Bailey, 916 S.W.2d at 807 (quoting Gunderson v. Sani-Kem Corp., 674 S.W.2d 665, 668 (Mo. Ct. App. 1984)). "[I]t is the defendant's participatory connection, for his personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product which calls for the imposition of strict liability." Bailey, at 807 (quoting Gunderson, 674 S.W.2d at 668).

The parties disagree about how the auger transaction occurred. Turner argues that he was told simply to hold the auger for sale, then modified the auger at the request of Farmers Elevator and received one check for the cost and modifications, and he then turned over the auger price to Shelton. Plaintiff alleges that defendant actually bought the auger from Shelton for $450, then modified it, then charged $1,150 to Farmers Elevator. There is a question of defendant Turner's particpatory connection, and personal benefit, when he modified the auger for Farmers Elevator.

There also is a genuine question of material fact about whether Turner sold augers in the regular course of his business. One occasional or incidental sale in the course of a business does not make a business subject to strict liability. Engel, 148 S.W.3d at 30-31. But Turner is an authorized dealer for Luffland Industries, a seller of augers. It is undisputed that Turner is listed as a Luffland dealer. He testified that he could have sold augers if a customer was interested, although he did not advertise that he did so. He did sell parts and repaired augers, and has sold at least one other auger in the past. There are a genuine questions of material fact about Turner's role in selling augers and about whether he sold the augur at issue here.

Further, the later modification of the augur does not matter because the condition, or defective nature,[7] of the auger at the time the auger left Turner is at issue here. "[P]laintiff must produce evidence that neither he nor any third person has made alterations to the product, which would create a defect that could be the proximate cause of the damages incurred." Jasinski v. Ford Motor Co., 824 S.W.2d 454, 455 (Mo. Ct. App. 1992). Plaintiff is not asserting that the removal of the rubber belting was the proximate cause of his injuries, but that the failure to have a proper guard on the auger is the cause of his injuries. Therefore, whether it was altered by the removal of the rubber banding is not an issue here. What is at issue is whether the auger was "defective" when it left Turner's facility and was placed in the stream of commerce.

There is also a genuine question of material fact about the nature of the auger when it left Turner. Defendant Turner argues that the rubber banding was adequate, and that to place a guard on it would not have been to Farmers Elevator's specifications. Plaintiff argues that the rubber banding was not an adequate safety measure, as at least one expert has testified. (Doc. 41 Attach. 11 at 61-62.)

---

[7]The question of whether the auger was defective is a question of fact for the jury to decide. See Miller v. Varity Corp., 922 S.W.2d 821, 825 (Mo. Ct. App. 1996).

Turner's final argument is that he modified the auger to Farmers Elevator's exact specifications, and that this absolves him from any liability. "[C]ontractors cannot ordinarily be held liable for injuries occurring after the owner's acceptance of the work." Bloemer v. Art Welding Co., 884 S.W.2d 55, 58 (Mo. Ct. App. 1994). An exception exists when inherently dangerous defects are known to the contractor but not detectable by careful examination by the owner accepting the work. Id. at 58. However, "the court held that such exception was inapplicable where the contractor performed the work in accordance with the owner's specifications, the owner had accepted the work, and there was no evidence that the owner relied on the contractor's expertise as to the proper design of the work to be performed." Bloemer, 884 S.W.2d at 58.

In cases where the contractor performed work in accordance with specifications, the owner gave the contractor "all specifications, plans, and drawings for the project." Fisher v. State Highway Commission of Missouri, 948 S.W.2d 607, 611 (Mo. 1997). Here, Farmers Elevator only provided dimensions, and did not specify the design or how the auger was to be modified for the purpose. Therefore, the instant case is unlike those where contractors performed work in accordance with specifications.

For the above reasons, the motions of defendants Turner, Pennewell, and Farmers Elevator for summary judgment are denied.

### D. Motions concerning expert Mark Ezra

Defendant Farmers Elevator has moved to exclude the opinions of plaintiff's expert Mark Ezra, and to bar any new opinions by him. (Docs. 34, 44). It argues that Ezra's opinions about the auger guard are irrelevant because he has no knowledge about this particular auger or the year it was manufactured. It also argues that plaintiff is now offering new opinions and those were not made known during the discovery of this lawsuit.

Defendant Turner has moved to strike plaintiff's supplemental Rule 26 disclosures (Doc. 52), because they contained affidavit information not provided until after discovery closed.

Plaintiff argues that expert Ezra is knowledgeable, the substance of his opinions did not change between his deposition and his post-deposition affidavit, and even if his opinions did change, defendant has not been prejudiced.

Federal Rule of Civil Procedure 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Civ. P. 702. "[U]nder the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993).

The court must first determine whether the expert is testifying to scientific or other technical knowledge. Daubert, 509 U.S. at 591; Kuhmo Tire Co. v. Carmichael, 526 U.S. 137, 149 (1999). Here, Ezra is an engineer who would testify about the technical issues involving the auger. (Doc. 35 Attach. 2, Ex. C.) Ezra based his deposition testimony on facts learned during the discovery phase. He based his opinions on photographs of the auger and inspections of the auger both before and after a metal guard had been installed. He also reviewed depositions and learned about the modifications Turner made to the auger. His opinions are based on sufficient facts learned during the discovery phase.

Defendant argues that at the time of his deposition, Ezra did not know the manufacturer, or model year, of the auger. (Doc. 35 Ex. G at 25-26.) However, Ezra stated that these facts did not matter to his opinion, so long as the auger was made during the 1970s, so the 1976 and 1991 standards would apply.

Ezra's opinions are based on reliable principles and methods. He was able to explain in detail in his deposition how an auger works. (Doc. 39 Ex. 2 at 31-32.) He explained, considering the mechanics of

the auger, how dangerous it would be without a guard. (Doc. 39 Ex. 2, at 48.) Further, he was able to apply these principles to the facts, explaining how plaintiff's hand was drawn into the auger and how he was harmed.

Ezra's deposition testimony contains information about industry standards, which are relevant and can be established by expert testimony. See Miller v. Yazoo Manufacturing Co., 26 F.3d 81, 83 (8th Cir. 1994) (industry standards helped jury understand condition of lawnmower and whether it was unreasonable dangerous). Here, Ezra discussed the standards published by the American Society of Mechanical Engineers and the application of these standards to augers. (Doc. 39 Ex. 2 at 35-37.) His explanation included how guards should cover all moving elements in an auger to avoid injury. This testimony is relevant in a case where injury due to lack of guard is at issue.

The affidavit opinions submitted after the close of discovery should not be stricken. Ezra's expert report, completed May 3, 2005, stated the opinion that:

> In order to protect individuals working near augers, the feed end of the auger is equipped with a metal wire end guard which is intended to prevent hands, limbs and feet from becoming entangled in the auger screw. The subject auger is missing the guard which should have been present on the feed end of the unit.

(Doc. 35 Attach. 2.) In his deposition, he opined that it would be practical to have a metal grating guard on the auger for safety, but that hard plastic could be used. He testified that a grating would have stopped plaintiff's hand and prevented it from becoming entangled in the auger. Essentially, he testified that the auger could have been equipped with a guard. He testified that he would use safety standards from 1796 or 1990 in his trial testimony, unless he learned the exact date of manufacture in the meantime. (Doc. 365 Attach. 3, at 47-49, 58.)

In an affidavit signed on July 12, 2006, Mark Ezra stated that he had reviewed the transcripts of Phil Turner, Scott Hayes, and Mike Utterback. He reported that he had learned new, significant information. At his deposition, he was unaware of the modifications of

-17-

the auger. In his opinion, the 2000 modifications were so substantial that a new auger was created. Therefore, the auger at issue was subject to the safety standards applicable in 2000. He opined that the rubber belting did not constitute a proper guard and that defendant Turner failed to adhere to safety standards. (Doc. 39 Ex. 1.)

The new affidavit opinion is generally the same in substance as the information previously given. See Dunafon v. Delaware McDonald's Corp., 691 F. Supp. 1232, 1234 (W.D. Mo. 1988). The Dunafon court found that the opposing party was not prejudiced by the new opinion. All parties knew that Ezra intended to testify about whether the auger satisfied safety standards, and that he was unaware of the manufacture date of the auger, or the modifications. He intended to testify that it did not meet safety standards for either the 1976 or 1991 rules. That his opinion has changed, in that the augur does not meet 2000 standards, is not so different as to amount to unfair surprise or prejudice. See Thudium v. Allied Products Corp., 36 F.3d 767, 770 (8th Cir. 1994). The year 2000 standards are relevant because the standards are applicable to any modifications that were made to the auger; it is undisputed that modifications were made to the auger in 2000. Further, defendants will not be prejudiced because Ezra can be made available to defendants for another deposition.

For these reasons,

**IT IS HEREBY ORDERED** that the motion of defendant Butch Pennewell for summary judgment (Doc. 30) is denied.

**IT IS FURTHER ORDERED** that the motion of defendant Farmers Elevator and Exchange Co. of Monroe City for summary judgment (Doc. 31) is denied.

**IT IS FURTHER ORDERED** that the motion of defendant Harvey Turner for summary judgment (Doc. 36) is denied.

**IT IS FURTHER ORDERED** that the motion of defendant Farmers Elevator to bar testimony of expert witness Ezra (Doc. 34) and to bar the new opinions of Ezra (Doc. 44) are denied.

**IT IF FURTHER ORDERED** that the motion of defendant Turner to strike plaintiff's Rule 26 disclosures (Doc. 52) is denied.

/s/ David D. Noce
**DAVID D. NOCE**
**UNITED STATES MAGISTRATE JUDGE**

Signed on September 13, 2006.